CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP 29 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

KATHRYN SIZEMORE,   )
    Plaintiff,   )
       )
v.   )    Civil Action No. 2:04cv00033
       )    **MEMORANDUM OPINION**
       )
       )
**JO ANNE B. BARNHART**,   )
**Commissioner of Social Security,**   )    By:  GLEN M. WILLIAMS
    Defendant.   )    Senior United States District Judge

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Kathryn Sizemore, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Sizemore's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3) (West 2003).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). " 'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." ' " *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Sizemore filed her application for SSI on or about August 20, 2001, alleging disability as of August 1, 1998, based on headaches, nerves, depression, fibromyalgia, thyroid goiter, high blood pressure and high cholesterol. (Record, ("R."), at 498-500, 508.) The claim was denied initially, (R. at 486), and upon reconsideration. (R. at 494-95.) Sizemore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 496.) The ALJ held a hearing on March 11, 2003, at which Sizemore was represented by counsel. (R. at 712-30.)

By decision dated June 26, 2003, the ALJ denied Sizemore's claim. (R. at 18-29.) The ALJ found that Sizemore had not performed substantial gainful activity since the alleged onset date of disability. (R. at 28.) The ALJ further found Sizemore's fibromyalgia was a severe impairment, but he found that it did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) The ALJ concluded that Sizemore's allegations regarding her limitations were largely not credible and that she had the exertional capacity to perform all of the requirements of light work.[1] (R. at 28.) The ALJ further

---

[1]Light work involves lifting and carrying items weighing up to 10 pounds frequently, 20 pounds occasionally, and considerable walking or standing with some pushing or pulling. *See* 20

found that Sizemore experienced pain that may have been such that it was noticeable to her at all times, but her pain was well controlled by the ongoing use of conservative medication. (R. at 23.) The ALJ found that Sizemore had no past relevant work. (R. at 28.) Based on Sizemore's age, education and residual functional capacity and the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ determined that Sizemore was not disabled. (R. at 28.) Thus, the ALJ concluded that Sizemore was not under a disability, as defined by the Act, at any time through the date of his decision, and that she was not entitled to benefits. (R. at 29.)

After the ALJ issued his decision, Sizemore pursued her administrative appeals, (R. at 16), but the Appeals Council denied her request for review. (R. at 9-11.) Sizemore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2005). The case is before this court on Sizemore's Motion For Summary Judgment filed on September 16, 2004, (Docket Item No. 14), and the Commissioner's Motion For Summary Judgment filed on November 17, 2004. (Docket Item No. 18.)

## II. Facts

A hearing was held before an ALJ on March 11, 2003, at which Sizemore testified. (R. at 712.) Sizemore testified that she was born on April 7, 1959, (R. at 715), which at the time of the ALJ's decision, classified her as a younger person under 20 C.F.R. § 416.963(c) (2005). She testified that she graduated from

---

C.F.R. § 416.967(b) (2005).

-3-

Appalachia High School with special training and certification in cosmetology. (R. at 715.) Sizemore reported that she had prior work experience as a cosmetologist, but she had not performed any work in this field in the previous 15 years. (R. at 715.) Sizemore testified that she could not work because of problems with pain, nerves and depression. (R. at 716.) She stated that she was in a car accident in 1987 or 1988, and it caused injuries to the right side of her body. (R. at 716.)

The ALJ questioned Sizemore regarding her alleged musculoskeletal impairments. He asked Sizemore about her head and neck, and she testified that her head and neck caused her pain. (R. at 716-17.) She stated she believed that her head and neck pain were primarily caused by stress and tension. (R. at 716-17.) Sizemore further testified that stress and tension also caused her shoulder and arm pain, which radiated into her back. (R. at 716-17.) She also stated that she was taking medication for her shoulder, back and arm pain. (R. at 717.) When further questioned about the pain, Sizemore testified that she was experiencing weakness in her arms, legs and shoulders. (R. at 718.) She stated that she loses feeling in her arms and hands, and this numbness caused her to drop things. (R. at 718-19.)

The ALJ then asked Sizemore what, if any, functional limitations she believed she had as a result of her alleged impairments. (R. at 719.) Sizemore testified that she could stand for 15 to 20 minutes, but after that she felt she would experience lower back pain. (R. at 719.)

She also testified that she could sit for 20 to 25 minutes, after which she believed that she would again experience lower back pain. (R. at 720-21.)

-4-

The ALJ then questioned Sizemore about her thyroid problem. (R. at 720.) Sizemore testified that she was currently taking medication for her thyroid problem, and that she had gained 60 pounds in the last year. (R. at 720.) Then she stated that she currently weighed 192 pounds and was five feet, two inches tall. (R. at 720-21.)

The ALJ asked Sizemore if she had a nerve problem, and she stated she suffered from anxiety. (R. at 721.) Sizemore testified that Dr. Moore treated her for both her nerve problems and her physical problems. (R. at 721.) She said that she had not been treated by a psychiatrist or a psychologist, but she had made appointments, which she had not kept. (R. at 721.) When asked why she had not kept the appointments Sizemore said that she did not like to go out and be around others. (R. at 721.)

Next, Sizemore testified about her medications. Stated that she took Xanax, Vistaril and Prozac. (R. at 722.) When asked about side effects caused by the medications, she stated that the Xanax made her light-headed and sleepy. (R. at 722.)

Sizemore testified that she did not drive to the hearing, and she stated did not have a driver's license. (R. at 723.) When asked why she did not have a driver's license, she stated that she had poor judgment on the road. (R. at 723.)

The ALJ then asked Sizemore if she had any trouble sleeping. (R. at 723.) She stated that she had trouble sleeping and took sleeping pills but was still up two to three times a night. (R. at 723-24.) She further testified that she still managed to get six or seven hours of sleep per night. (R. at 723-24.) Sizemore also testified that she

-5-

napped between one and one and a half hours per day due to side effects caused by her medication. (R. at 724.) She also stated that she did not leave the house very often because she did not like being around people anymore. (R. at 724-25.) She said she felt isolated and did not enjoy communicating with others. (R. at 724-25).

The ALJ asked Sizemore if she was suffering from any other problems, and she testified that she suffered from stomach problems. (R. at 725.) She stated that she had been diagnosed with irritable bowel syndrome, which caused her to have episodes of diarrhea and rectal bleeding. (R. at 725-26.) Sizemore also testified that she had been seen by a gastroenterologist for her irritable bowel syndrome. (R. at 725.)

Upon examination by her attorney, Sizemore testified that the most significant problem she experienced, which was preventing her from working, was the problem with her neck and shoulder. (R. at 727.) She testified that her right shoulder was more burdensome than her left shoulder, and her right shoulder caused her more pain than her left shoulder. (R. at 727.) She then stated that she had been taking medication continually for her shoulder and neck pain. (R. at 727.)

In rendering his decision, the ALJ reviewed records from Dr. R. Michael Moore, M.D., (R. at 251-321, 541-53), B. Wayne Lanthorn, Ph.D., (R. at 701-10), Dr. G. S. Kanwal, M.D., (R. at 434-38), Howard S. Leizer, Ph.D., a state agency psychologist, (R. at 604-22), and Dr. Richard M. Surrusco, M.D., a state agency physician, (R. at 603).

-6-

Sizemore's primary care physician was Dr. Moore. Dr. Moore had been treating her for her fibromyalgia syndrome, anxiety and depression on or before October 24, 1988. (R. at 251-321.) On September 9, 1999, Dr. Moore ordered a high resolution ultrasound of Sizemore's neck. (R. at 557.) Dr. M.R. Ramakrishnan, M.D., read the x-ray and found that she had a moderately enlarged thyroid gland showing hypoechoic texture. (R. at 557.) There were no focal lesions, cystic or solid, seen within her thyroid. (R. at 557.) He noted that the findings were suggestive of some form of thyroiditis. (R. at 557.) On March 10, 2000, Sizemore was treated by Dr. Moore. (R. at 553.) She complained of neck swelling and neck pain. (R.at 553.) Dr. Moore diagnosed her with goiter and prescribed Vioxx and Darvocet. (R. at 553.) Next, Sizemore visited Dr. Moore in April for a follow-up visit. (R. at 552.) Sizemore presented to Dr. Moore that her neck was swollen, she had been vomiting, and she had experienced hot flashes. (R. at 552.) Dr. Moore noted moderate swelling in her neck, anxiety, fibromyalgia and hypothyroidism. (R. at 552.) He prescribed Xanax, Tylenol 3 and a Celstone injection. (R. at 552.) Sizemore next saw Dr. Moore on July 5, 2000, for a regular checkup of her thyroid. (R. at 551.) He noted that she was having tension headaches, anxiety, chronic cervical stress and hyperthyroidism. (R. at 551.) Then he prescribed Prozac, Remeron, Synthroid and Fluoxetine but made no other changes in her medications. (R. at 551.). Her next thyroid checkup was on October 5, 2000. (R. at 550.) There were no changes from the previous visit and no changes in her medications. (R. at 550.). Sizemore was seen by Dr. Moore on January 1, 2001, and the only change he noted was that Sizemore appeared depressed. (R. at 549.) Her next visit at Dr. Moore's office was on May 2, 2001, and there were no changes. (R. at 548.) This regular pattern of thyroid checkups continued from June 14, 2001, until October 25, 2002, with no

-7-

significant changes in her condition. (R. at 541-47, 626-44, 658.) On January 21, 2003, Sizemore was seen by Dr. Moore, and she complained of numbness in her right arm and right leg. (R. at 655.)  This was the only notable change from her previous thyroid checkups. (R. at 655.)

On December 22, 1999, Sizemore was seen by Dr. Kanwal, a state agency physician. (R. at 434-435.)  Dr. Kanwal determined that Sizemore had generalized musculoskeletal pain with minimal limitation of movement, irritable bowel syndrome, cephaligia and anxiety and depression secondary to generalized pain. (R. at 435.) Dr. Kanwal completed a Medical Assessment of Ability To Do Work-Related Activities, (Physical), and found the following: her lifting and carrying ability were  affected; she could lift 10 pounds from very little to up to one third of an eight hour day; her standing and walking ability were not affected; she could sit for eight hours in an eight hour day; she could sit for two hours continually without interruption; she could occasionally climb, balance and crouch; she could never stoop, kneel or crawl; and her ability to reach and push were affected. (R. at 436-38.)

Sizemore went to the St. Mary's Hospital emergency room on May 30, 2001. (R. at 589-90.)  She complained of neck pain and difficulty talking.  She was treated and released. (R. at 589-90.) Sizemore was seen again at St. Mary's Hospital  on August 25, 2001. (R. at 581-87.)  She complained of upper abdomen pain, nausea and vomiting. (R. at 581-87.)  An acute abdominal series x-ray was performed on Sizemore, and the findings were constipation and chronic obstructive pulmonary disease, ("COPD"). (R. at 586.)  Sizemore went to the Wellmont Lonesome Pine Hospital emergency room on January 4, 2002, complaining of dysphagia and

-8-

diarrhea. (R. at 597.) A radiographic study of the abdomen was performed, and no acute lesions were seen. (R. at 598.)

Dr. Moore referred Sizemore to Gastroenterology Associates where she was seen by Dr. Robert C. Patton, M.D. (R. at 599.) In a letter by Dr. Patton to Dr. Moore, dated January 4, 2002, Dr. Patton stated his impressions were that Sizemore had dysphagia, bowel dysfunction that was possibly related to irritable bowel syndrome, hematochezia, thyroid goiter, degenerative arthritis and a history of anxiety and depression. (R. at 599-601.) On January 25, 2002, Dr. Patton performed an endoscopy and colonoscopy on Sizemore. (R. at 593-596.) Dr. Patton's impression from the endoscopy and colonoscopy was dysphagia related to benign narrowing of distal esophagus, which was treated with dilatation to 52 French. (R. at 601.) He also found superficial gastritis, normal duodenoscopy, colon excrescence and hemorrhoids. (R. at 594.) Dr. Patton's comments and recommendations were as follows: "This patient will continue with her anti-reflux regimen and she will continue with Equalactin and chew two tablets three times daily for irritable bowel syndrome." (R. at 594.) Dr. Patton then stated, "I am hopeful that the dilatation will give her relief of her dysphagia." (R. at 594.)

On February 28, 2002, Sizemore went to Lonesome Pine Hospital complaining of abdominal pain. (R. at 590.) A CT scan of the upper abdomen with and without contrasts and a CT scan of the pelvis were performed. The CT scans were read by Dr. Ramakrishnan, and his impression from the CT scans were that Sizemore's abdomen and pelvis were essentially normal. (R. at 591.)

-9-

Dr. Moore, completed a medical evaluation form for the Virginia Department of Social Services regarding Sizemore on September 25, 2002. (R. at 623-25.) His diagnosis was that Sizemore suffered from chronic back pain, hyperthyroidism and anxiety. (R. at 623.) He found that she could never lift, stoop, climb or bend. (R. at 623.) Also, he determined that she could sit for 30 minutes, stand for up to one hour, walk up to a quarter of a mile, and she could use a keyboard, handle small items, follow instructions, drive a car, reach and hear. (R. at 624.) However, he found that she could not place light items, weighing five pounds or less, on shelves above her head, and she should avoid all stress. (R. at 623.) He also stated that the expected duration of her illness/incapacitation was for her lifetime. (R. at 624.) Dr. Moore then determined that Sizemore could not participate in the following activities: a job search, job skill training, education, job readiness training or employment. (R. at 625.) Yet her condition did not hinder her ability to care for her children. (R. at 625.) Also, Dr. Moore recommended that Sizemore quit her job, reduce work hours or take a leave of absence for health reasons. (R. at 625.) Dr. Moore noted that her condition would impede her ability to work even beyond the end of the treatment period. (R. at 625.)

In a report by Dr. Richard M. Surrusco, M.D., a state agency physcian, dated October 9, 2002, Dr. Surrusco found that Sizemore was obese and had multiple trigger points for fibromyalgia. (R. at 603.) He further found that she had hypertension but no end organ damage. (R. at 603.) Dr. Surrusco stated that although she had a diagnosis of COPD, her lungs were clear. (R. at 603.) He found that Sizemore had hypothyroid and hyper-cholesterol. (R. at 603.) He also determined that she had a diagnosis of tension headaches, but she was neurologically intact. (R

-10-

at 603.)  Finally, Dr. Surrusco determined that there was no evidence of a severe medical impairment, and her allegations were not considered credible.  (R. at 603.)

Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on October 9, 2002.  (R. at 604-18.)  Leizer found that Sizemore was mildly mentally retarded.  (R. at 608.)  He also found that Sizemore had a mild degree of limitation in her daily living and social functioning. (R. at 614.)  Also, he believed that Sizemore had a moderate degree of limitation in maintaining concentration, persistence or pace.  (R. at 614.)  Leizer found no episodes of decompensation of extended duration.  (R. at 614.)

In an addendum to the PRTF, Leizer noted that a consultative examination in 1999 revealed that Sizemore had borderline to low average intelligence.  (R. at 618.) He stated that her IQ scores were actually in the 60s but the consultative examiner observed that she was distracted and that her functioning was higher than what her test scores reflected.  (R. at 618.)  Leizer stated that Sizmore's  daily activities included taking her own medication, grocery shopping, housework, cooking and caring for her son, feeding her cats, but she stated she had no hobbies or other social activities and she needed no assistance with hygiene.  (R. at 618.)  He also noted she was prescribed seven medications and she administered them independently.  (R. at 618.)  Finally, he stated that the evidence revealed that she may have difficulty with complicated tasks, but she was able to perform most ordinary activities independently.  (R. at 618.)  Sizemore's actual functioning was thought to be in the borderline to low average range. (R. at 618.)  She had been prescribed medication for anxiety by her family doctor but was not treated by a mental health professional.  (R.

at 618.)   She was able to make her own decisions and communicate and interact appropriately with others. (R. at 618.)   Also, Leizer stated that her condition did not preclude simple, unskilled work activity. (R. at 618.)

Leizer also completed a Mental Residual Functional Capacity Assessment on Sizemore, dated October 9, 2002. (R. at 619-21.) He determined that Sizemore was not significantly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to change in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of

-12-

others. (R. at 619-20.) Leizer found Sizemore to be moderately limited in her ability to understand and remember detailed instructions and in her ability to carry out detailed instructions. (R. at 619.)

Dr. Moore completed another medical evaluation form for the Virginia Department of Social Services regarding Sizemore on October 25, 2002. (R. at 646-47) There were no differences in his findings from the previous medical evaluation dated September 25, 2002. (R. at 623-25.)

Dr. Moore then filled out a third medical evaluation form for the Virginia Department of Social Services on January 21, 2003. (R. at 659-60.) There was no change in the information contained in the prior evaluation form, which he completed on October 25, 2002. (R. at 646-47.)

On April 4, 2003, Sizemore was evaluated by B. Wayne Lanthorn, Ph.D. (R. at 701-07.) In a report dated May 3, 2003, (R. at 701-07), Lanthorn made the following diagnoses: dysthymic disorder, late onset, mild; and personality disorder not otherwise specified, ("NOS") and Lanthorn placed Sizemore's Global Assessment of Functioning, ("GAF"), score at 60.[2] (R. at 706.) Lanthorn found that Sizemore related numerous somatic concerns, and her limitations in relation to these physical illnesses should be evaluated by a physician. (R. at 706.) Sizemore did report

---

[2] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . . ." DSM-IV at 31.

-13-

symptoms of depression of a chronic nature, but she had not been involved in any significant therapy or counseling on a regular basis, which might have been beneficial to her. (R. at 706.) Finally, Lanthorn noted that Sizemore tended to portray herself in an especially negative or pathological manner, and this pattern was often associated with a deliberate distortion of the clinical feature, and the critical items should be reviewed to evaluate the possibility of malingering. (R. at 706.) He stated that the test results potentially involve considerable distortion and were unlikely to be an accurate reflection of the Sizemore's subjective clinical status. (R. at 706-07.)

Lanthorn then filled out a Medical Assessment To Do Work Related Activities (Mental). (R. at 708-10.) In this assessment, Lanthorn found that Sizemore had the unlimited ability to understand, remember and carry out simple job instructions. (R. at 709.) He found she had a fair ability in the following areas: to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed, but not complex job instructions and to maintain personal appearance. (R. at 708-09.) Lanthorn believed that Sizemore had a poor ability to deal with work stresses, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 708-09.) Lanthorn concluded that Sizemore's physical problems and personality disorder supported his assessment. (R. at 709.)

-14-

## II. Analysis

The Commissioner uses a five-step process in evaluating SSI claims under the Act. *See* 20 C.F.R. § 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated June 26, 2003, the ALJ denied Sizemore's claim. (R. at 18-29.) The ALJ found that Sizemore had not performed substantial gainful activity

-15-

since the alleged onset date of disability. (R. at 28.) The ALJ further found Sizemore's fibromyalgia was a severe impairment, but it did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) The ALJ concluded that Sizemore's allegations regarding her limitations were largely not credible, and that she has the exertional capacity to perform all of the requirements of light work. (R. at 28.) The ALJ further found that Sizemore experienced pain that may have been such that it was noticeable to her at all times, but that her pain was well controlled by the ongoing use of conservative medication. (R. at 23.) The ALJ found that Sizemore had no past relevant work. (R. at 28.) Based on Sizemore's age, education and residual functional capacity and the Grids, the ALJ found that Sizemore was not disabled. (R. at 28.) Thus, the ALJ concluded that Sizemore was not under a disability, as defined by the Act, at any time through the date of his decision, and that she was not entitled to benefits. (R. at 29.)

Sizemore argues that the ALJ's decision was not based on substantial evidence. (Motion for Summary Judgment and Memorandum of Law on Behalf of the Plaintiff ("Plaintiff's Brief"), at 7.) She next alleges that the ALJ erred when he failed to give great weight to all evidence of record, which would indicate a finding of "disability." (Plaintiff's Brief at 8.) Sizemore then argues that the ALJ erred when he determined that she does not suffer from a severe mental impairment. (Plaintiff's Brief at 11.) Finally, Sizemore argues that the ALJ erred by not eliciting testimony from a vocational expert. (Plaintiff's Brief at 12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not

weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Sizemore argues that the ALJ's decision was not based on substantial evidence. (Plaintiff's Brief at 7.) Specifically, Sizemore argues that the ALJ erred in not giving controlling weight to the conclusion of her treating physician, Dr. Moore, who diagnosed her with chronic back pain, hypothyroidism and anxiety disorder. Dr. Moore opined in three separate Virginia Department of Social Service Medical Evaluation forms that Sizemore was unable to work and that her incapacitation was expected to last her lifetime. (R. at 420-21, 623-25, 645-47.)

Under the regulations controlling weight is given to a treating source only if his opinions are

> well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . .

20 C.F.R. § 416.927(d)(2) (2005). Furthermore, the decision as to whether an individual is disabled is reserved for the Commissioner, and the Commissioner is not bound by a statement of disability by a medical source. *See* 20 C.F.R. § 416.927(e)(1) (2005).

Dr. Moore filled out three medical evaluation forms for Sizemore in her pursuit for financial assistance from the Virginia Department of Social Services. These three forms were dated September 25, 2002, (R. at 623-25), October 25, 2002, (R. at 646-47), and January 21, 2003, (R. at 659-60). In all three forms, Dr. Moore found that Sizemore suffers from chronic back pain, hyperthyroidism and anxiety. (R. at 623, 646, 659.) He found that she could never lift, stoop, climb or bend. (R. at 623, 646, 659.) However, he determined that she could sit for 30 minutes, stand for up to one hour, walk up to a quarter of a mile, she could use a keyboard, handle small items, follow instructions, drive a car, reach and hear (R. at 623, 646, 659.) He also stated that her condition did not hinder her ability to care for her children. (R. at 625, 647, 660.) These forms were check-off forms, and Dr. Moore did not provide any supporting medical rationale for his conclusions. (R. at 623-25, 646-47, 659-60.) Therefore, this evidence was not supported by medically acceptable clinical and laboratory diagnostic techniques and not entitled controlling weight. *See* 20 C.F.R. 416.927(d)(2). Also, throughout Sizemore's lengthy medical history of more than 20

-18-

years with Dr. Moore, at no other place within her medical records, other than on the Virginia Department of Social Services forms, does Dr. Moore state that he believes that she is disabled and incapable of working.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker,* 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d)(2). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996.) (quoting *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76F.3d at 590.

The ALJ correctly discredited Dr. Moore's opinions of disability and properly found that Sizemore's complaints of pain and other limiting symptoms were not credible to the extent alleged. (R. 623-25.) Therefore, based on the above, the court finds that substantial evidence supports the ALJ's rejection of Dr. Moore's opinion that Sizemore is disabled, and that substantial evidence supports the ALJ's finding that Dr. Moore's opinion does not merit controlling weight.

-19-

Sizemore next argues that the ALJ erred when he failed to give great weight to all evidence of record which would indicate a finding of "disability." (Plaintiff's Brief at 8.) In particular, Sizemore argues that the ALJ erred by discrediting the medical opinions contained in the record and by doing so substituted his own opinion for those of the medical experts. (Plaintiff's Brief at 11.) As stated above, it is the ALJ's duty to weigh the evidence, including the medical evidence. *See Taylor,* 528 F.2d 1156. Title 20 Code of Federal Regulations § 416.927(d) provides a list of factors which the ALJ may use to determine the weight that must be given to any medical opinion. Supportability is one of the factors listed.

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the] [Commissioner] will give that opinion. The better an explanation a source provides for an opinion, the more weight [the] [Commissioner] will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with [an] [individual], the weight [the] [Commissioner] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. [The] [Commissioner] will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. § 416.927(d)(3).

In his opinion, the ALJ rejected Dr. Moore's opinion that the claimant was disabled. The ALJ based his finding on the fact that the evidence in the case record did not contain x-rays, an MRI, scans, lab reports or functional capacity studies to support his diagnosis and opinions. (R. at 25.) In other words, Dr. Moore's opinion was not supportable. Also, at no time, other than on the three Department of Social

-20-

Services forms, which were filled out by Dr. Moore less than four months apart, did Dr. Moore opine that he believed Sizemore was disabled. (R. at 623, 646, 659.) Additionally, when Dr. Moore stated this opinion on the forms, he provided no basis for this conclusion. Therefore, under 20 C.F.R. §416.927(d)(3), the ALJ did not err by not giving great weight to Dr. Moore's opinion because it was not a supportable medical opinion.

For the same reason the ALJ did not err by rejecting the consultative examination of Dr. Kanwal. (R. at 25.) Dr. Kanwal based his findings on subjective complaints made by Sizemore, and he did not list any objective findings to support his conclusions. (R. at 436-38). Furthermore, Dr. Kanwal's impression that Sizemore only suffered from generalized musculoskeletal pain with minimal limitation of movement, which improved when passively helped, (R. at 435), further supports the ALJ's conclusion that Sizemore maintained the residual functioning capacity to perform light work.

The ALJ also did not err when he rejected the assessment of B. Wayne Lanthorn. (R. at 25.) Lanthorn found that Sizemore was seriously limited but not precluded due to mental problems. ( R. at 701-07.) In his report, Lanthorn stated regarding Sizemore's Personality Assessment Inventory, ("PAI"), scores that

> Some of these factors fall outside of the normal range, suggesting that the respondent may not have answered in a completely forthright manner; the nature of her response might lead the examiner to form a somewhat inaccurate impression of the client based up on the style of responding described below.

(R. at 705.) Lanthorn also stated:

Case 2:04-cv-00033-GMW   Document 22   Filed 09/29/05   Page 21 of 23   Pageid#: 90

With respect to negative impression management, there are indications suggesting that the client tended to portray herself in an especially negative or pathological manner. This pattern is often associated with a deliberate distortion of the clinical feature and the critical items should be reviewed to evaluate the possibility of malingering. The test results potentially involved considerable distortion and are unlikely to be an accurate reflection of the respondent's subjective clinical status. Interpretations of clinical scales would be an inaccurate personality characterization.

(R. at 706.) The ALJ properly discredited Lanthorn's conclusions as not being consistent with the documentary evidence and his own evaluation especially, in light of the fact that Lanthorn also found that Sizemore had a GAF score of 60. Therefore, based on the above, the court finds that there is substantial evidence to support the ALJ's rejection of Dr. Moore's, Dr. Kanwal's and Lanthorn's conclusions.

Sizemore also argues that the ALJ erred when he determined that she did not suffer from a severe mental impairment. (Plaintiff's Brief at 11.) However, all of the evidence that Sizemore cites in her brief to support this claim pre-dates the prior ALJ decision of April 26, 2000. (R. at 460-72.) Since she did not seek to reopen that prior decision, it is barred by *res judicata. See* 20 C.F.R. § 416.1457(c)(1).

In addition, as previously stated, the ALJ properly rejected Lanthorn's mental status assessment. And, although Dr. Moore had been treating Sizemore for anxiety and depression, he was doing so only with medication and he never recommended that she seek professional mental counseling. (R. at 251-317, 376-96, 626-30, 655-58.) Furthermore, Leizer's October 9, 2002, mental assessment supports the ALJ's finding on this issue.

-22-

Finally, Sizemore argues that the ALJ erred by not eliciting testimony from a vocational expert. (Plaintiff's Brief at 12.) This argument has no merit. While a vocational expert is required to testify when evidence of a nonexertional impairment exists, *Grant v. Schweiker,* 699 F.2d 189 (1983), here the ALJ found that Sizemore only suffered from an exertional impairment and not a nonexertional impairment. (R. at 26-28.) Based on the above stated reasons, that finding is supported by the record. Therefore, the ALJ was not required to elicit testimony from a vocational expert and properly applied the Grids. *See* 20 C.F.R. § 416.969a(d).

### *III. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be SUSTAINED; Sizemore's motion for summary judgment will be OVERRULED; and the court will affirm the Commissioner's decision denying benefits

An appropriate order will be entered.

DATED: This 29ᵗʰ day of September, 2005.

*[signature]*

SENIOR UNITED STATES DISTRICT JUDGE

-23-